**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**DIANNE C. REILLY,**

                                **Plaintiff,**

-vs-                                                    Case No.  **6:07-cv-230-Orl-19GJK**

**NOVARTIS PHARMACEUTICALS**
**CORPORATION,**

                                **Defendant.**
_____

# ORDER

This case comes before the Court on the following:

1.      Defendant Novartis Pharmaceutical Corporation's Motion For Summary Final Judgment, Statement Of Undisputed Facts And Supporting Memorandum Of Law (Doc. No. 25, filed Jan. 18, 2008);

2.      Plaintiff Dianne C. Reilly's Memorandum Of Law In Opposition To Defendant's Dispositive Motion For Summary Judgment (Doc. No. 27, filed Feb. 19, 2008); and

3.      Plaintiff's Notice Of Filing Deposition Transcripts In Support Of Memorandum Of Law In Opposition To Defendant's Dispositive Motion For Summary Judgment (Doc. No. 28, filed Feb. 19, 2008).

**Background**

Plaintiff Dianne C. Reilly was employed by Defendant Novartis Pharmaceuticals Corporation until January 13, 2005, when she was involuntarily terminated.  (Doc. No. 1 at p. 4, ¶ 10.)  She has brought this action against Defendant for unlawful sex and age discrimination and retaliation, alleging violations of the Florida Civil Rights Act of 1992 ("FCRA"), §§ 760.01-760.11,

Fla. Stat. (2007), and Florida's "Whistleblower Act," §§ 448.101-448.105, Fla. Stat. (2007).  (Doc. No. 1 at p. 1, ¶ 1.)

### I.      Material Facts About Which There Is No Dispute

Plaintiff was initially hired as a Pharmaceutical Sales Representative by Defendant on or about January 2, 1978 at the age of twenty-two and remained continuously employed with the company until her involuntary termination on January 13, 2005.  (Doc. No. 2 at p. 4, ¶ 10; Doc. No. 12 at p. 3, ¶ 10.)  During her twenty-seven years of employment with Defendant, Plaintiff held various positions, including Regional Manger, Manager of Special Markets, and Senior Neuroscience Specialist.  (Doc. No. 2 at p. 4, ¶ 12; Doc. No. 12 at p. 3, ¶ 12.)  At the time of her termination, Plaintiff was a Senior Sales Specialist in Defendant's Neuroscience division.  (Doc. No. 2 at p. 4, ¶ 12; Doc. No. 12 at p. 3, ¶ 12.)  In that position, Plaintiff was responsible for, among other things, visiting physicians in the greater Orlando area in order to persuade them to prescribe for their patients various pharmaceutical products manufactured and sold by Defendant.  (Doc. No. 25 at p. 3, ¶ 3; Doc. No. 27 at p. 2.)

From a time in approximately 2002 until her termination, Plaintiff's immediate supervisor was Gail Barker.  (Doc. No. 25 at p. 3, ¶ 4; Doc. No. 27 at p. 3.)  Initially, Plaintiff performed well under Ms. Barker's supervision, and Ms. Barker's performance evaluations of Plaintiff prior to 2004 identified Plaintiff as a solid performer.  (Doc. No. 25 at p. 4, ¶ 8; Doc. No. 27 at p. 3.)

In mid-2003, Defendant realigned its sales territories which resulted in Plaintiff losing Melbourne and Vero Beach and gaining Daytona Beach and Volusia County as part of her sales territory.  (Doc. No. 25 at p. 3, ¶ 5; Doc. No. 27 at p. 3.)  Also in 2003, Plaintiff was assigned a new sales partner, Joe McCreight.  (Doc. No. 25-9 at pp. 13-14.)

In 2004, the sales in Plaintiff's territory declined.  (Doc. No. 25 at p. 4, ¶ 10; Doc. No. 27 at p. 4.)  Nevertheless, Plaintiff's partner, Mr. McCreight, was promoted to a non-sales operational position within the company.  (Doc. No. 25-2 at p. 6, ¶ 18(a); Doc. No. 27 at p. 4.)  Therefore, Plaintiff was assigned a new partner, Sean McCaffrey.  (Doc. No. 25-2 at p. 7, ¶ 18(c); Doc. No. 27 at p. 4.)  The sales in Plaintiff's territory continued to decline.  (Doc. No. 25-2 at pp. 2-3, ¶ 7; Doc. No. 27 at p. 4.)  During Plaintiff's mid-year performance review in 2004, Ms. Barker indicated that Plaintiff needed to improve her sales performance, leadership skills, collaboration with coworkers, and accountability.  (Doc. No. 25-19 at pp. 4-7, 12.)

Plaintiff's sales figures continued to slip, and in October of 2004, Ms. Barker placed Plaintiff on a Performance Improvement Plan ("PIP").  (Doc. No. 25 at p. 6, ¶ 14; Doc. No. 27 at p. 4.)  The PIP set a series of goals for Plaintiff to meet during a ninety-day evaluation period.  (Doc. No. 25-4.)  After being placed on the PIP, Plaintiff did improve in several areas,[1] but continued to perform "below expectations" in a number of other areas.[2]  (Doc. No. 25 at p. 6, ¶ 15; Doc. No. 27 at p. 6.)  Plaintiff met with Ms. Barker on December 15, 2004 to conduct a seventy-day review of her progress while on the PIP.  (Doc. No. 25 at p. 7, ¶ 17; Doc. No. 27 at p. 6.)

On December 22, 2004 and again on January 7, 2005, Plaintiff sent emails to Ms. Barker, Ms. Barker's supervisor Stan Garrard, and LeeAnne Torelli in Human Resources claiming that the PIP was discriminatory and that she was being treated unfairly based on her age and sex.  (Doc. No.

---

[1]     Plaintiff met her calls per day, Exelon starter sampling, weekly counterpart meetings, and call notes goals, and her Exelon sales had shown some improvement.  (Doc. No. 25-4.)

[2]     Plaintiff's performance was "below expectation" in Exelon sales, allocation of calls, patient enrollment in the "Experience the Difference" program, team meetings, and coworker feedback goals.  (Doc. No. 25-4.)

25 at p. 7, ¶¶ 18-19; Doc. No. 27 at p. 6.)  Also on January 7, 2005, Plaintiff sent an additional email to Ms. Barker, Mr. Garrard, Ms. Torelli, and Michael Galari of Defendant's finance department informing them that Ms. Barker was paying performance bonuses in cash and not withholding taxes as required by law.  (Doc. No. 25 at p. 7, ¶ 20; Doc. No. 27 at pp. 6-7.)

On January 13, 2005, Plaintiff was terminated.  (Doc. No. 25 at p. 8, ¶ 21; Doc. No. 27 at p. 7.)  She was forty-nine (49) years old at the time and was the oldest female sales representative under Ms. Barker's supervision.  (Doc. No. 25 at p. 3, ¶ 6; Doc. No. 27 at p. 7.)

### II.    Procedural History

Plaintiff originally brought this action in Florida state court, and Defendant removed the case to this Court on February 14, 2007.  (Doc. Nos. 1-2.)  Plaintiff filed a Verified Complaint alleging three counts: (1) discriminatory discipline and discharge based on Plaintiff's age and sex; (2) retaliation against Plaintiff for complaining of sex and age discrimination; and (3) retaliation against Plaintiff for complaining of Defendant's alleged violation of federal tax laws.  (Doc. No. 2; Doc. No. 25 at p. 1, ¶ 1; Doc. No. 27 at p. 1.)  Defendant filed an Answer denying Plaintiff's claims of discrimination and retaliation.  (Doc. No. 12.)  Currently pending before the Court is Defendant's Motion for Summary Judgment on all counts.  (Doc. No. 25.)  Plaintiff has filed a Response in opposition to Defendant's Motion.  (Doc. No. 27.)

### Standard of Review

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled judgment as a matter of law."  Fed. R. Civ. P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256,

1259 (11th Cir. 2004).  An issue of fact is "material" if, under the applicable substantive law, it might affect the outcome of the case.  *Hickson Corp.*, 357 F.3d at 1259.  An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party.  *Id.* at 1260.  A court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.*; *Anderson*, 477 U.S. at 251-52.

The party moving for summary judgment has the burden of proving that: (1) there is no genuine issue as to any material fact, and (2) it is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party.  *Anderson*, 477 U.S. at 255.  The court may not weigh conflicting evidence or weigh the credibility of the parties.  *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993).  If a reasonable fact finder could draw more than one inference from the facts and that inference creates an issue of material fact, a court must not grant summary judgment.  *Id.*  On the other hand, summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial."  *Celotex Corp.*, 477 U.S. at 322.

**Analysis**

I.      **Discrimination under the FCRA**

A.      **Applicable Law**

The FCRA was modeled after Title VII of the Federal Civil Rights Act, 42 U.S.C. §§ 2000e to 2000e-17 (2006), as well as the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-34 (2006). *Joshua v. City of Gainesville*, 768 So. 2d 432, 435 (Fla. 2000); *Brown Distrib. Co. of W. Palm Beach v. Marcell*, 890 So. 2d 1227, 1230 n. 1 (Fla. 4th DCA 2005). Federal case law interpreting Title VII and the ADEA is applicable to cases arising under the FCRA. *Jones v. United Space Alliance, LLC*, 494 F.3d 1306, 1310 (11th Cir. 2007); *Zaben v. Air Prods. & Chems., Inc.*, 129 F.3d 1453, 1455 n. 2 (11th Cir. 1997); *Brown Distrib. Co. of W. Palm Beach*, 890 So. 2d at 1230 n. 1. Thus, for claims of sex and age discrimination under the FCRA premised on circumstantial evidence, the burden shifting rules articulated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), apply. *Gamboa v. Am. Airlines*, 170 F. App'x 610, 612-13 (11th Cir. 2006); *Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340, 1345 (11th Cir. 2000).[3]

In a case in which a plaintiff alleges discriminatory treatment, the plaintiff must first establish a *prima facie* case of unlawful discrimination. *E.g.*, *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286 (11th Cir. 2000). When a plaintiff alleges discrimination, she must demonstrate that: (1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly situated employees outside of her protected class more favorably

---

[3]        Both parties cite to cases applying the *McDonnell Douglas* burden shifting analysis in discussing Plaintiff's claims of discrimination. (Doc. No. 25 at p. 8 & n. 2; Doc. No. 27 at pp. 9-10, 12-13.)

or replaced her with an employee outside of her protected class;[4] and (4) she was qualified to do the job. *Id.*; *Bogle v. Orange County Bd. of County Comm'rs*, 162 F.3d 653, 656-57 (11th Cir. 1998). In the context of age discrimination, the comparator employee outside of the plaintiff's protected class must be "substantially younger" than the plaintiff. *Bogle*, 162 F.3d at 656-57.

Once a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the employer to produce "legitimate, non-discriminatory reasons for its employment action." *Joe's Stone Crab, Inc.*, 220 F.3d at 1286 (internal quotation marks and citations omitted). "If such a reason is produced, a plaintiff then has the ultimate burden of proving the reason to be a pretext for unlawful discrimination." *Id.* The United States Supreme Court has offered some further guidance about proof of pretext:"[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

To summarize, a plaintiff bears the initial burden to produce evidence of all four elements of the *prima facie* case. *E.g.*, *Walker v. Mortham*, 158 F.3d 1177, 1183-85 & n. 10 (11th Cir. 1998). If she produces this evidence, then the burden of production but not of persuasion shifts, and the employer may produce evidence of a legitimate, non-discriminatory reason(s) for its employment

---

[4]    *Toney v. Montgomery Jobs Corps*, 211 F. App'x 816, 818 (11th Cir. 2006) ("A plaintiff may establish a *prima facie* case of employment discrimination by identifying an individual outside his protected class who replaced him . . . or showing that his employer treated a similarly situated employee outside his class more favorably."); *Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1082 (11th Cir. 2005) (same).

action.  *Id.*  If the employer meets this intermediate burden, then the burden of production shifts back to the plaintiff to prove pretext.  *Id.*[5]

### B.     *Prima Facie* Case

Defendant argues that Plaintiff has failed to produce evidence of the third element of her *prima facie* case, namely, that she "cannot identify 'similarly situated' employees outside of her protected class(es) that were treated more favorably."  (Doc. No. 25 at p. 9.)[6]  Plaintiff denies this claim and asserts that she has produced evidence that, unlike her younger and male coworkers, she was placed on an unrealistic PIP which ultimately led to her termination.  (Doc. No. 27 at pp. 9-13.)

### 1.     Similarly Situated Employees

The Eleventh Circuit Court of Appeals has explained the degree to which a comparator employee must be similarly situated: "The plaintiff and the employee she identifies as a comparator must be similarly situated 'in all relevant respects.'  The comparator must be nearly identical to the plaintiff to prevent courts from second-guessing a reasonable decision by the employer."  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004) (internal citation omitted).  Furthermore, "In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways."  *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001) (citations omitted).  Both "the quantity and the quality

---

[5]     For a thorough explanation of the burdens of proof and production in the employment discrimination law context, see Robert Belton, *Burdens of Pleading and Proof in Discrimination Cases: Toward a Theory of Procedural Justice*, 34 Vand. L. Rev. 1205, 1215-16 (1981).

[6]     Plaintiff is in two protected classes as: (1) a woman, and (2) a person over the age of forty.

of the comparator's misconduct [must] be nearly identical . . . ." *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999).[7]

Ms. Barker[8] detailed Plaintiff's recent employment history as follows:

Prior to 2004, Ms. Reilly's overall performance earned her a ranking as a "solid" performer. . . . During that time, however, I received complaints from Reilly's co-workers and from physician offices about her behavior. For instance, in May 2003, a Dr. Price wrote a letter to me . . . complaining about Ms. Reilly's unprofessional behavior toward his staff and requesting that she not return to his office. Similarly, I found Reilly to have contentious relationships with several sales representatives with whom she worked. I verbally counseled Reilly regarding these issues, but did not initiate any formal discipline at that time.

In 2004, Reilly's sales results and activity dropped to a level unacceptable for someone in a Senior Sales position. Specifically, her ranking for one of the drugs she promoted, Exelon, dropped from thirty-ninth nationwide at the end of 2003 to seventy-eighth in mid-2004; Reilly also had slipped to the bottom thirty-three percent of sales personnel nationwide in terms of overall sales. Along with these declining sales numbers, I continued to receive feedback from other Novartis sales representatives who worked with Reilly concerning Reilly's ability to work with them in a professional manner, and I continued to be made aware of complaints from physicians and their staffs regarding Reilly's abrasive and unprofessional manner (some of whom had refused to speak with Reilly anymore).

In reviewing these developments, I came to the conclusion that Reilly's interpersonal problems with peers and physicians finally had begun to impact negatively on her sales performance. I consulted with my supervisor, John "Stan" Garrard ("Garrard") and LeeAnne Torelli (nee Bucci) ("Bucci") in Novartis' Human

---

[7]    *See also Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316-19 (11th Cir. 2003) (although the employee and comparator had committed the same act, they were not similarly situated because comparator's overall record was better); *Silvera*, 244 F.3d at 1260 (plaintiff and comparator who both committed assault were not similarly situated because plaintiff had three prior arrests, with the most recent occurring a few months before his termination, and comparator had one prior arrest that occurred two years earlier); *Maniccia*, 171 F.3d at 1368-69 (female employee who committed four policy violations was not similarly situated to male employees who each committed only one violation).

[8]    Ms. Barker is a female employee who was approximately thirty-eight (38) years old in 2004.  (Doc. No. 25-2 at p. 1, ¶ 2.)

Resources department ("HR") about this situation, and we developed a strategy to deal with Reilly's performance issues.

As part of the above-mentioned strategy, in August 2004, I addressed Reilly's performance issues with her during her mid-year review. . . .  Reilly's overall sales figures after that review, however, continued to slip into the bottom twenty-five percent nationwide, prompting me - again in consultation with Garrard and Bucci - to place Reilly on a ninety-day Performance Improvement Plan ("PIP"), effective October 6, 2004. . . .

The PIP set forth in detail her deficiencies in several different areas, or "competencies" - sales performance ("Results Driven"), her interactions with physicians and their offices ("Customer Quality & Focus"), and her interactions with co-workers ("Collaboration"). It also set forth benchmarks in each of these competencies that Reilly needed to meet in order to raise her performance to an acceptable level.

After being placed on the PIP, Reilly did improve in a few areas; however, she continued to perform below expectations with respect to a number of aspects regarding both sales results and her interactions with physicians and co-workers. Particularly troublesome were the continued reports I received regarding Reilly's unprofessional behavior toward co-workers and physicians. One example of this unprofessional behavior was Reilly making a presentation in late November 2004 to a doctor while wearing kneepads. According to the report I received from her territory partner at the time, Sean McCaffrey, Reilly got down on her knees before the physician and (in the presence of the physician's wife, who also worked in the office) said that she was going to do two things to the doctor while on her knees - beg and pray that he prescribe Exelon. This incident, in my view, was an inappropriate display demonstrating poor judgment on Reilly's part. . . .

In mid-December 2004, at her seventy-day PIP review, I shared my concerns about these issues with Reilly. This was part of a discussion of whether, after seventy days, Reilly was on target to meet the performance objectives set forth in the PIP. . . .

Upon the conclusion of the 90-day period set forth in the PIP in early January 2005, Garrard, Bucci and I again conferred and determined that Reilly had failed to improve her performance sufficiently to justify her retention. Based upon that determination, Garrard and I met with Reilly on January 13, 2005, and informed her of her termination effective that date.

(Doc. No. 25-2 at pp. 2-5.)  Plaintiff has not offered any evidence to suggest that these complaints were not in fact made against her or that this summary is inaccurate.  Therefore, with this work

history in mind, the Court must determine whether Plaintiff has produced evidence of similarly situated employees outside of her protected classes who were treated more favorably than Plaintiff.

At various stages of the litigation, Plaintiff has pointed to Aaron Trenary, Joe McCreight, Sean McCaffery, Jon Williams, Audra Chiellini, and Kerri Lawton as similarly situated employees who were treated more favorably than she was.  The Court considers each employee in turn.

Aaron Trenary,[9] a former sales partner of Plaintiff, stated in his deposition that his sales performance and calls had dipped below the required numbers in the past.  (Doc. No. 28-7 at pp. 47, 71-73, 121.)  In fact, around 2002, Ms. Barker placed Mr. Trenary on a "coaching plan," which was apparently a predecessor to a PIP.  (*Id.* at pp. 73, 121-22.)  Mr. Trenary also said that a client had once complained about him, but he did not know the details of the complaint.  (*Id.* at p. 79.)  Plaintiff seemed to be privy to the details, however, and testified in her deposition: "The [customers'] complaints [against Mr. Trenary] had to do with the customers' perceptions of Aaron based on some of his mannerisms.  Aaron had had a speech impediment when he was a child and had been given a lot of coaching."  (Doc. No. 25-9 at p. 16.)  Thus, accordingly to Plaintiff's own testimony, the complaints against Mr. Trenary were different in kind from the complaints against Plaintiff.  This is confirmed by Ms. Barker, who stated in her sworn declaration,"At no time did I receive any complaints about Trenary being unprofessional in the manner in which [Plaintiff] had been."  (Doc. No. 25-2 at p. 7, ¶ 18(b).)  Plaintiff has not offered any evidence to the contrary; therefore, she has not demonstrated that Mr. Trenary was a similarly situated employee.

---

[9]  Mr. Trenary is a male employee who was approximately fifty (50) years old in 2004. (Doc. No. 27-2 at p. 1.)

Joe McCreight,[10] another former sales partner of Plaintiff's, performed poorly in sales but nevertheless was promoted to a non-sales operational position on Ms. Barker's recommendation. (Doc. No. 25-9 at p. 24.)   According to Plaintiff, Mr. McCreight had a Masters of Business Administration and was actively interested in management opportunities.  (*Id.*)  Plaintiff, on the other hand, admittedly "was not interesting in being a manager . . . ." (*Id.* at p. 25.)  Ms. Barker also explained:

> As [Plaintiff's] partner, McCreight's sales performance mirrored hers; however, I did not receive any complaints about his conduct towards physicians or co-workers similar to what I was hearing about Reilly.  I did recommend McCreight for a promotion to a non-sales operational position, since I understood that McCreight's ultimate goal was to be involved in that area of the Company and had no reason to believe that he was anything other than professional and a team player. [Plaintiff] at no time ever indicated that she wanted a promotion.

(Doc. No. 25-2 at p. 6, ¶ 18(a).)  While Plaintiff has shown that Mr. McCreight was not disciplined for his poor sales performance, Plaintiff has failed to produce any evidence of complaints about Mr. McCreight's professionalism or teamwork.  Accordingly, Plaintiff has not shown that Mr. McCreight was a similarly situated employee.

Sean McCaffrey[11] was Plaintiff's sales partner at the time she was terminated.  (Doc. No. 25-2 at p. 7, ¶ 18(c).)  Therefore, his sales performance mirrored hers at the end of 2004.  (Doc. No. 28-5 at pp. 32, 98-101.)  In his deposition, Mr. McCaffrey admitted that his sales calls fell below the required number on occasion.  (*Id.* at pp. 77-78.)  However, he was never placed on a PIP.  (*Id.* at

---

[10]   Mr. McCreight is a male employee who was approximately forty-two (42) years old in 2004.  (Doc. No. 27-2 at p. 1.)

[11]   Mr. McCaffrey is a male employee who was approximately twenty-eight (28) years old in 2004.  (Doc. No. 27-8 at p. 1.)

p. 78.) Mr. McCaffrey also stated that, to his knowledge, no physicians had complained ever about him. (*Id.* at p. 203.)  Likewise, Ms. Barker explained:

> At the time I placed [Plaintiff] on her PIP, McCaffrey had not been in that role long enough for me to believe that he had any role in the troubles plaguing that territory; thus, I did not think discipline was necessary.  Nor had I heard any complaint about McCaffrey similar to what I heard about Reilly.

(Doc. No. 25-2 at p. 7, ¶ 18(c).)  Plaintiff has not produced any evidence of any complaints against Mr. McCaffrey; therefore, she has not demonstrated that Mr. McCaffrey was a similarly situated employee.

Jon Williams[12] also had a sales performance comparable to that of Plaintiff, but the record does not reveal any complaints against Mr. Williams from coworkers or physicians.  (*See id.* at p. 7, ¶ 18(d).)  In fact, during her deposition, Plaintiff testified:

> Q:    Mr. Williams, other than the sales issues, are you aware of any other–you know, in terms of the level of sales, are you aware of any other issues in terms of his performance, either company policies, procedures, conduct issues, anything?
>
> A:    Jon?
>
> Q:    Yes.
>
> A:    No.
>
> Q:    So his issue was just sales.  Basically, his sales of Exelon weren't very good?
>
> A:    Right.

(Doc. No. 25-9 at p. 35.)  Thus, Plaintiff has not demonstrated that Mr. Williams was a similarly situated employee.

---

[12]     Mr. Williams is a male employee who was approximately sixty-one (61) years old in 2004.  (Doc. No. 27-8 at p.1.)

Plaintiff makes similar allegations against Audra Chiellini,[13] claiming that Ms. Chiellini had poor sales performance but was not subject to disciplinary action. (Doc. No. 25-9 at p. 32.) Plaintiff further claims that Ms. Chiellini falsified sales calls, delayed sending in her sample signature forms for over two months when they were due weekly, and used the company credit card for personal use. (*Id.* at pp. 33-35.) Regarding the first two issues, Plaintiff has no personal knowledge of these allegations and merely testifies as to rumor and hearsay. (*See id.*) Such testimony is inadmissible and will not be considered as evidence. Fed. R. Evid. 802. Even if this evidence were admissible, Plaintiff has not produced evidence that Ms. Barker actually knew of this alleged misconduct.[14] Regarding the credit card issue, Ms. Barker explained that Ms. Chiellini used the company card accidentally and was verbally reprimanded for this mistake. (Doc. No. 28-2 at pp. 158-59.) The record does not reveal any complaints against Ms. Chiellini from coworkers or customers, and the few instances of misconduct that Plaintiff cites are not equivalent in kind or degree to the complaints against Plaintiff.[15] Therefore, Plaintiff has not shown that Ms. Chiellini was a similarly situated employee.

---

[13] Ms. Chiellini is a female employee who was approximately thirty-one (31) years old in 2004. (Doc. No. 27-8 at p. 1.)

[14] *See Jones v. Gerwens*, 874 F.2d 1534, 1542 (11th Cir. 1989) (finding that a plaintiff failed to make out a *prima facie* case of discrimination when he "failed to adduce evidence of knowledge" of the misconduct of other employees on the part of the employer).

[15] *See Holifield v. Reno*, 115 F.3d 1555, 1563 (11th Cir. 1997) (declining to find a coworker "similarly situated" when that coworker "was not accused of the same or similar conduct" as the plaintiff).

Lastly, Plaintiff alleges Keri Lawton[16] violated a number of company policies but was not subject to equivalent disciplinary action.  Plaintiff first claims that Ms. Lawton was insubordinate in refusing to work with her.  (Doc. No. 25-10 at p. 20.)  Next, Plaintiff asserts that Ms. Lawton went on sales calls with her husband who works for a competitor.  (*Id.*)  Finally, Plaintiff avers that Ms. Lawton allegedly planned a trip to the wine country with some physicians which "at that time was against the self-imposed guidelines that the pharmaceutical industry had set."  (*Id.*)  However, Ms. Lawton's supervisor in 2004 was Jose Rivera and not Ms. Barker.  (Doc. No. 28-6 at pp. 14-15.)  Since Plaintiff is alleging that it was Ms. Barker who discriminated against Plaintiff (Doc. No. 25-12 at p. 16.), Mr. Rivera's disciplinary practices are irrelevant.[17]

Even assuming actions by a separate supervisor were relevant in this case, Plaintiff again produces no evidence whatsoever that Mr. Rivera knew of these allegations of misconduct.  (*See* Doc. No. 25-10 at p. 20.)  She also does not provide evidence of any complaints by physicians or coworkers against Ms. Lawton.  (*See id.*)  Therefore, Plaintiff has failed to demonstrate that Ms. Lawton was a similarly situated employee.

While Plaintiff has offered evidence of younger or male workers with similarly low sales numbers who were not placed on PIPs or terminated, Plaintiff has failed to produce evidence of other employees with complaints against them of the same nature and degree as Plaintiff.  (*See* Doc.

---

[16]   Ms. Lawton is a female employee who was approximately thirty-two (32) years old in 2004.  (Doc. No. 27-2 at p. 2.)

[17]   *See Silvera*, 244 F.3d at 1261 n. 5 ("But differences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination."); *Gerwens*, 874 F.2d at 1541 ("Courts have held that disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis.").

No. 27 at pp. 12-13 & n. 4.)  Thus, Plaintiff has failed to produce evidence of similarly situated employees outside of her protected classes who received more favorable treatment.

## 2.      Replacement

Nevertheless, a plaintiff alleging a discriminatory discharge may meet the third element of the *prima facie* case by producing evidence that she was replaced by an individual outside of her protected class.  *E.g.*, *Bolton v. Potter*, 198 F. App'x 914, 916 (11th Cir. 2006); *Maynard v. Bd. of Regents of Univs. of Fla. Dept. of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003).  Defendant admits "that a male under the age of 40 eventually was assigned to take over Reilly's territory."  (Doc. No. 12 at p. 5, ¶ 37.)  Thus, the uncontroverted evidence demonstrates that after Plaintiff was discharged, she was replaced by an individual outside of her protected classes: a male at least ten (10) years younger.  (*See id.*)  Therefore, Plaintiff has established a *prima facie* case of discrimination.

## C.      Legitimate Nondiscriminatory Reason

Since Plaintiff has established a *prima facie* case of discrimination, the burden of production shifts to Defendant to "articulate a legitimate, nondiscriminatory reason for the challenged employment action."  *E.g.*, *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc).  This intermediate burden is "exceedingly light."  *Holifield*, 115 F.3d at 1564.  The reason must only be "one that might motivate a reasonable employer . . . ."  *Chapman*, 229 F.3d at 1030.

In its Motion for Summary Judgment, Defendant asserts the following:

As set forth in the declarations submitted with this Motion, [Plaintiff] was placed on a PIP because [Defendant] had received numerous complaints about her interaction with co-workers and physicians and had poor sales performance.  She was terminated when she was unable to adequately improve her performance in these areas after being placed on the PIP.  These reasons are independent of [Plaintiff's] sex and/or age.

(Doc. No. 25 at p. 11.)  Defendant has included the sworn statements of Gail Barker, John ("Stan")

Garrard, and LeeAnne Torelli to support this assertion.  (Doc. Nos. 25-2, 25-5, 25-7.)  Ms. Barker

explained in some detail the complaints she received about Plaintiff as well as Plaintiff's declining

sales figures.[18]  This explanation for placing Plaintiff on a PIP and ultimately terminating her is one

that might motive a reasonable employer.  *See Chapman*, 229 F.3d at 1030.  Thus, Defendant has

met its burden to produce evidence of a legitimate, nondiscriminatory reason for its adverse

employment actions against Plaintiff.

### D.        Pretext

Since Defendant has met its intermediate burden, the burden of production shifts back to

Plaintiff to demonstrate that Defendant's articulated reason for the adverse employment action is a

mere pretext for unlawful discrimination.  *Holifield*, 115 F.3d at 1565.  This demonstration merges

with Plaintiff's ultimate burden of proving that Defendant intentionally discriminated against

Plaintiff.  *Id.*  As the Eleventh Circuit has explained:

> If the defendant articulates one or more such reasons, the presumption of
> discrimination is eliminated and "the plaintiff has the opportunity to come forward
> with evidence, including the previously produced evidence establishing the prima
> facie case, sufficient to permit a reasonable factfinder to conclude that the reasons
> given by the employer were not the real reasons for the adverse employment
> decision." . . .  If the plaintiff does not proffer sufficient evidence to create a genuine
> issue of material fact regarding whether each of the defendant employer's articulated
> reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's
> claim.

*Chapman*, 229 F.3d at 1024-25 (internal citations omitted).  In other words, a plaintiff must "come

forward with sufficient evidence to permit a reasonable factfinder to find that [the employer's]

reasons were pretextual."  *Id.* at 1028.

---

[18]        Reproduced in Section I.B.1, *supra*.

In her Response in opposition to Defendant's Motion for Summary Judgment, Plaintiff advances three arguments to support her claim of pretext: (1) Defendant has failed to produce a legitimate, non-discriminatory reason for placing Plaintiff on a PIP and not her younger, male counterparts with similar sales performance problems; (2) Ms. Barker demonstrated discriminatory animus towards Plaintiff when Ms. Barker said she wanted Mr. McCreight to confront one of the male doctors who had declining prescriptions "because she thought it would be better to have a 'man to man' conversation"; and (3) Defendant set Plaintiff up to fail by instituting a PIP that "created an untenable standard of performance, as it was largely based upon nebulous and, often contradictory, criteria."  (Doc. No. 27 at pp. 13-15.)

First, Defendant has produced legitimate, non-discriminatory reasons for placing Plaintiff on a PIP: her declining sales performance in 2004 and interpersonal problems with clients and coworkers.  (Doc. No. 25-2 at pp. 2-3, ¶¶ 7-9.)  The undisputed testimony reveals that none of Plaintiff's younger or male coworkers had both the poor performance and the substantial number of complaints from coworkers and clients that Plaintiff did.  (*Id.*)

Second, Plaintiff does not in any way correlate the "man to man" statement she attributes to Ms. Barker to her placement on the PIP or her termination.  Plaintiff explained this incident further in her deposition:

> Q:        But was Ms. Barker saying anything to you about your performance at that time?
>
> A:        She was wondering why–a couple of physicians come to mind specifically on one of the products, Exelon.  Two of the high prescribers, their volume of Exelon had decreased, because we're analyzing market share and trends and trying to figure out what we can do and why it changed.
>
>           Sometime in 2000–towards the end of 2003, early 2004 as we were doing this process, it was decided that these two doctors should be

confronted with the prescription data that we as a company had, which was confidential information to us.

We were not supposed to share it with anyone outside the company, and it's a very delicate matter to discuss with a physician or to confront them. They knew that we knew what they were doing in terms of their prescription, but we didn't discuss it with them.

But it was decided that these two physicians should be confronted about that, and I was not the one chosen to confront them. Joe McCreight was chosen to confront them with the sales data, even though I had been there and knew them longer. He had only known them at that point probably six months or less.

And it was said specifically about one of the physicians in particular that [Ms. Barker] felt that it would come better coming from a man.

(Doc. No. 25-9 at pp. 13-14.)  According to this testimony, Mr. McCreight was selected over Plaintiff, because of his gender, to "confront" two physicians about declining sales.  (*See id.*)  This did not deny Plaintiff a sales opportunity, and Plaintiff has not alleged that the incident negatively affected her performance or subsequent evaluations.  Even when this statement is construed in the light most favorable to Plaintiff as circumstantial evidence of discriminatory animus, such evidence does not go to the veracity of Defendant's articulated legitimate, nondiscriminatory reasons for placing Plaintiff on a PIP and terminating her.  Thus, it does not raise a genuine issue of material fact as to pretext.[19]

---

[19]    The Eleventh Circuit has been hesitant to conclude that such "ambiguous stray remarks" constitute evidence of pretext.  As the Eleventh Circuit explained in the context of race discrimination:

But even if somehow construed as racial, we conclude that the comments were ambiguous stray remarks not uttered in the context of the decisions at issue and are not sufficient circumstantial evidence of bias to provide a reasonable basis for a finding of racial discrimination in the denial of the promotions.

(continued...)

Third, Plaintiff's argument that the PIP was untenable misses the point; Defendant had legitimate, nondiscriminatory reasons for terminating Plaintiff in October 2004.  (Doc. No. 25-2 at pp. 2-3, ¶¶ 6-9.)  Rather than immediately terminating Plaintiff, however, Defendant gave Plaintiff an opportunity to improve by placing her on a PIP.  (Doc. No. 25-4.)  While Plaintiff argues that the requirements under the PIP were unfair, the PIP merely required Plaintiff to strictly comply with the nominal requirements placed on her coworkers.  (*See* Doc. No. 25-4; Doc. No. 25-9 at p. 30; Doc. No. 25-10 at p. 26; Doc. No. 25-12 at pp. 14-15.)  Further, the wisdom or fairness of the PIP's requirements do not negate the reasons for placing Plaintiff on the PIP.  As the Eleventh Circuit has stated, "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply

---

[19](...continued)
    *Ash v. Tyson Foods, Inc.*, 190 F. App'x 924, 926 (11th Cir. 2006); *see also Dalmau v. Vicao Aerea Rio-Grandense, S.A.*, 337 F. Supp. 2d 1299, 1310 (S.D. Fla. 2004) ("The only evidence that [the plaintiff] has offered of age discrimination are a few stray remarks which are legally insufficient to create a jury issue with regard to age discrimination.").

quarreling with the wisdom of that reason." *Chapman*, 229 F.3d at 1030.[20]  Thus, Plaintiff's third

argument also fails to demonstrate pretext.

In her deposition, Plaintiff generally alleged that she felt excluded by Ms. Barker and that

they had a contentious relationship.  (Doc. No. 25-9 at pp. 16-23.)  Such testimony, however, does

not constitute evidence of discrimination based on age or sex.  *See Wilson*, 376 F.3d at 1092

(rejecting evidence of a contentious relationship as evidence of discrimination).  As the Eleventh

Circuit has stated, "[C]onclusory allegations of discrimination, without more, are not sufficient to

raise an inference of pretext or intentional discrimination where [an employer] has offered . . .

extensive evidence of legitimate, non-discriminatory reasons for its actions."  *Carter v. City of

Miami*, 870 F.2d 578, 585 (11th Cir. 1989) (citation omitted).  Thus, Plaintiff has failed to rebut

Defendant's legitimate, non-discriminatory reason by producing evidence that this reason was really

a pretext for sex or age discrimination.

On the contrary, there is "extensive evidence" of Defendant's legitimate, nondiscriminatory

reasons for its actions.  The evidence shows that Plaintiff's sales performance did in fact decline in

---

[20]     *See also Alexander v. Fulton County*, 207 F.3d 1303, 1341 (11th Cir. 2000) ("[I]t is
not the court's role to second-guess the wisdom of an employer's decisions as long
as the decisions are not [unlawfully] motivated."); *Damon v. Fleming Supermarkets
of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999) ("We have repeatedly and
emphatically held that a defendant may terminate an employee for a good or bad
reason without violating federal law. . . .  We are not in the business of adjudging
whether employment decisions are prudent or fair."); *Chapman*, 229 F.3d at 1030
(quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991))
("Federal courts do not sit as a super-personnel department that reexamines an
entity's business decisions. No matter how medieval a firm's practices, no matter how
high-handed its decisional process, no matter how mistaken the firm's managers,
[federal discrimination law] does not interfere. Rather our inquiry is limited to
whether the employer gave an honest explanation of its behavior." (internal quotation
marks omitted)).

2004.  (Doc. No. 25-19.)  During that same year, at least five of Plaintiff's coworkers submitted unfavorable reviews of Plaintiff.  (Doc. No. 25-4.)[21]  Comments included: "[Plaintiff] is ineffective in the territory and the situation has no chance of getting better.  She refuses to collaborate on equal standing with her counterparts.  Furthermore she is abrasive and worn out her welcome with customers."  (*Id.* at p. 9.)  "[Plaintiff] creates rifts between the team."  (*Id.* at p. 11.)  "[Plaintiff] works more as an individual and makes her counterparts feel like her competitor.  She does not work towards the same goal, but rather looks at ways to tear down her counterparts."  (*Id.* at p. 12.)  "If I could have rated [Plaintiff] lower than was allowed, I would have.  [Plaintiff] is poison to this territory!"  (*Id.*)  "All of the business relationships with our counterparts [are] riddled with distrust for [Plaintiff] and her business acumen.  Again, this is the main reason why ALL of the neuroscience counterparts in our territory will not work with [Plaintiff]."  (*Id.* at p. 18.)

Coworkers also described some serious complaints from clients regarding Plaintiff.  For example, one of her former counterparts wrote:

> She is demanding and can be obnoxious.  In Dr. Price's office she was thrown out and banned forever . . . .  Our biggest group practice . . . changed their policy to "lunch only" because she over-pressured the doctors and staff at times, and according to Dr. Brown, "jumped them in the parking lot."  These actions and countless others have had a tremendous impact on Novartis business in the territory.  my estimate is that she is welcomed in less than 25% of the offices.  The other 75% she is either ineffective or detrimental to the business.  Multiple office staffs are vocal about their dislike of [Plaintiff] calling her "demanding," "fake," and comment on her hygiene.

---

[21]   Other than Plaintiff's speculation, there is no evidence in the record that Ms. Barker sought peer review only from those coworkers she knew disliked Plaintiff.  (*See* Doc. No. 25-10 at p. 24.)  Of the six different coworkers who commented negatively on Plaintiff, two were her former sales partners, one was her current sales partner, one worked in her sales territory, and two worked in overlapping sales territories.  (*See* Doc. No. 25-4; Doc. No. 28-2 at p. 132-33.)  The record reflects that there were usually only about three coworkers at a time working in Plaintiff's territory.  (Doc. No. 28-2 at p. 132.)

(*Id.* at p. 9.)  Other comments included: "I have had numerous complaint[s] from offices regarding [Plaintiff].  Most notably one complaint from Doctor[s] Cunha, Macdonald (sic) in Ormond [B]each Florida.  The Office manager Brian says that [Plaintiff] strongarms the physicians and their time."

(*Id.* at p. 11.)  Another coworker wrote about an incident in which Plaintiff put on two knee pads:

> She then knelt beside Dr. Geliga and said that there were only two things that she could do with these knee pads on while kneeling.  The Dr. began to laugh and his wife was laughing as well, but seemed to be doing it only out of courtesy. . . .  I could tell that they were privy to the sexual connotation that was being implied unknowingly by [Plaintiff].  She then stopped laughing and said that the two things that she could do with the knee pads on were beg and pray that he would prescribe more Exelon by the end of the year.

(Doc. No. 25-4 at p. 16.)  Furthermore, a doctor wrote a letter to Ms. Barker about Plaintiff's conduct during one of her sales calls at his office: "I find this behavior unusual, unprofessional, and unacceptable."  (Doc. No. 25-3 at p. 31.)

During the coworkers' depositions, Plaintiff's counsel attempted to discredit the bases for these comments.  (*See* Doc. Nos. 28-5, 28-7.)  However, the issue is not whether the comments were based in truth or were justified or warranted; the issue is whether these comments were in fact made to Plaintiff's supervisor and served as the basis for adverse employment actions.  Discrimination is "about actual knowledge, and real intent, not constructive knowledge and assumed intent."  *Silvera*, 244 F.3d at 1262.  Thus, a mistaken but honestly held belief on the part of the employer may defeat a claim of employment discrimination.  *Id.* at 1261.  As the Eleventh Circuit has explained, "[A]n employer who treats two employees differently because of a mistaken belief in the existence of a neutral reason does not violate Title VII."  *Id.*  In other words, "Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action."  *Id.* (quoting *Wolf v. Buss (America) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996)).

The uncontested evidence indicates that Ms. Barker initially gave Plaintiff positive performance reviews, but these reviews took a downward turn as Plaintiff's sales performance declined in 2004.  (Doc. No. 25-9 at pp. 15, 29-30.)  While Ms. Barker had received complaints about Plaintiff's behavior before this time, Ms. Barker stated that in mid-2004 she "came to the conclusion that [Plaintiff's] interpersonal problems with peers and physicians finally had begun to impact negatively on her sales performance."  (Doc. No. 25-2.)  Thus, Plaintiff's declining sales performance was "the straw that broke the camel's back."  *Maniccia*, 171 F.3d at 1369 (quoting *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1313 (11th Cir. 1998)).  Ms. Barker consulted with Mr. Garrard and Ms. Torelli concerning what to do about improving Plaintiff's performance.  (Doc. No. 25-2 at p. 3, ¶ 8; Doc. No. 25-5 at p. 2, ¶ 6; Doc. No. 25-7 at p. 2, ¶ 5.) They collectively decided to place Plaintiff on a PIP.  (Doc. No. 25-2 at p. 3, ¶ 9; Doc. No. 25-5 at p. 2, ¶ 7; Doc. No. 25-7 at p. 2, ¶ 6.)  When Plaintiff had not fully met the expectations of the PIP after ninety days, Ms. Barker again consulted with Mr. Garrard and Ms. Torelli, and they decided to terminate Plaintiff.  (Doc. No. 25-2 at pp. 4-5, ¶ 13; Doc. No. 25-5 at pp. 3-4, ¶ 11; Doc. No. 25-7 at p. 3, ¶ 10.)

No doubt Plaintiff expected more loyalty from a company for which she had worked for twenty-seven years; however, poor treatment is not the same thing as discriminatory treatment. Plaintiff has failed to produce evidence raising a genuine issue of material fact that Defendant's legitimate, nondiscriminatory reasons for placing her on a PIP and terminating her employment were pretext for discrimination.  Therefore, the Court must grant Defendant's Motion for Summary Judgment on Count I.

## II.      Retaliation Under the FCRA and Florida's Whistleblower Act

As recognized by both parties, claims of retaliation under the FCRA and Florida's Whistleblower Act are analyzed under the *McDonnell Douglas* burden shifting framework utilized in Title VII retaliation cases.  (Doc. No. 25 at p. 16; Doc. No. 27 at p. 15 n. 6); *see also Drago v. Jenne*, 453 F.3d 1301, 1307 (11th Cir. 2006); *Sierminski v. Transouth Fin. Corp.*, 216 F.3d 945, 950 (11th Cir. 2000).  First, a plaintiff must establish a *prima facie* case of retaliation by producing evidence that: (1) the plaintiff was engaged in statutorily protected conduct; (2) plaintiff suffered an adverse employment action; and (3) there was a causal connection between the statutorily protected conduct and the adverse employment decision.  *Drago*, 453 F.3d at 1307; *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999).  Once a plaintiff establishes a *prima facie* case, the burden of production shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action.  *Farley*, 197 F.3d at 1336.  If the employer meets its burden of production, then the burden shifts back to plaintiff to prove that the employer's proffered reason is  merely pretext for unlawful retaliation.  *Id.*

On December 22, 2004, Plaintiff wrote Ms. Barker, Mr. Gerrard, and Ms. Torelli an email in which she stated: "I am writing to express my belief that this performance improvement plan is discriminatory in nature and holds me to a different standard than my peers." (Doc. No. 25-4 at p. 34.)  On January 7, 2005, Plaintiff wrote in another email: "I also notice that you did not refute my allegation that there are different standards put on me than on my peers . . . . I believe that there is bias being used on both my age and my gender." (*Id.* at p. 36.)  Later that same day, Plaintiff sent an additional email stating:

> I am sending this memo to let you know of a situation I have just become
> aware of.  We have previously enjoyed in our district being able to use promotional

monies to fund cash prizes for sales growth in "blitz" contests, which was very nice. However, I have recently learned from my accountant that this may be illegal, that I have to report this income and, unfortunately, it was not included on my pay stubs and likely will not be on my W-2.

I wanted you to know that I will self report this on my taxes when I give the infformation (sic) to my accountant to file.  I thought you should know so that perhaps this can be fixed and taxes can be withheld in the future.

(*Id.* at p. 38.)  Plaintiff was terminated several days later, on January 13, 2005.

Defendant only challenges the third element of Plaintiff's *prima facie* case and argues that Plaintiff cannot prove a causal connection between her protected conduct and her termination.  (Doc. No. 25 at p. 16.)  However, to prove a causal connection, a plaintiff need only demonstrate "that the protected activity and the adverse action were not *wholly unrelated*."  *Farley*, 197 F.3d at 1337 (citations omitted).  As the Eleventh Circuit has explained, "We have plainly held that a plaintiff satisfies this element if he provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action."  *Id.*  Since Plaintiff was terminated less than a month after engaging in protecting activity, Plaintiff has produced evidence of a causal connection and has established a *prima facie* case of retaliation.

The burden of production thus shifts to Defendant to articulate a legitimate, non-retaliatory reason for terminating Plaintiff.  *See Farley*, 197 F.3d at 1336.  As explained in detail above, Defendant has satisfied this burden by producing evidence that Plaintiff was terminated for her poor sales and behavioral issues.  *See* Section I.C, *supra*.  Therefore, the burden of production shifts back to Plaintiff to produce evidence raising a genuine issue of material fact that Defendant's articulated reasons were pretextual.  *See Farley*, 197 F.3d at 1336.

To prove pretext, Plaintiff relies almost entirely on the temporal proximity between her emails to Defendant regarding discrimination and possible violations of tax law and her termination. (Doc. No. 27 at p. 16.)  While temporal proximity may show that the protected activity was not wholly unrelated in the context of a *prima facie* case, such evidence does not on its own create a genuine issue of material fact of pretext.  As Judge King in the Southern District of Florida has stated: "Standing alone against Defendant's strongly supported legitimate reason for terminating [Plaintiff], temporal proximity does not amount to more than a scintilla of evidence of retaliation. This is insufficient." *Padron v. BellSouth Telecomms., Inc.*, 196 F. Supp. 2d 1250, 1257 (S.D. Fla. 2002).  Judge King continued, "Nor does it move the case forward from the *prima facie* case to 'the specific proofs and rebuttals of discriminatory motivation the parties have introduced.'" *Id.* (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 516 (1993)).[22]

Instead, Plaintiff's evidence tends to support Defendant's position that Plaintiff was not fired in retaliation for her complaints.[23]  As Plaintiff stated in her deposition:

---

[22]     *See also Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1368 (11th Cir. 2000) (finding, in a case in which a Plaintiff submitted a FLMA request on the same day she was terminated, "Appellant has failed to raise a genuine dispute of material fact as to whether her termination was caused by her Family and Medical Leave Act request. Rather, the record demonstrates that Appellant was fired . . . for repeated and numerous punctuality infractions").

[23]     Though not considered evidence, the arguments of Plaintiff's counsel demonstrate the inherent inconsistencies in Plaintiff's claims of retaliation.  In the Response, counsel argues that the PIP on which Plaintiff was placed in early October 2004 "rendered her dismissal an inevitability."  (Doc. No. 27 at p. 13.)  This of course occurred over two months before Plaintiff sent her complaining emails. However, counsel later argues that Plaintiff was instead terminated because of these complaints.  Counsel then asserts, "Also relevant to the issue of pretext is Novartis' complete failure to take Reilly's complaints seriously."  (*Id.* at p. 16.)  This is relevant for exactly the reason counsel says it is: Defendant did not take Plaintiff's complaints seriously.  In fact, Ms. Barker ignored them entirely.  (*Id.*)  These claims

(continued...)

Q:    Okay.  So it was your view that in September '04 Ms. Barker had already decided that you were out?

A:    She had already started setting things in motion to–I believe she had an end in sight and she was trying to find facts to justify what she had determined to do, yes.

(Doc. No. 25-9 at p. 23.)  Plaintiff was placed on a ninety-day PIP on October 5, 2004, and the following day, Ms. Barker warned Plaintiff in writing: "I must, however, inform you that should you fail to meet the overall performance improvement plan objectives, or fail to sustain improvement following satisfactory completion of the plan, we will have no alternative but to take further job action up to and including termination of your employment."  (Doc. No. 25-4 at p. 4.)  On December 15, 2004, Plaintiff met with Ms. Barker to conduct a seventy-day review of her performance under the PIP.  (Doc. No. 25-12 at pp. 6-7.)  Plaintiff described of the meeting:

[Ms. Barker] also advised me after that meeting that at this point she could not counsel me or offer any other advice about anything that we had discussed–sorry–and that–just that she couldn't counsel me or anything else after this point.

So it sounded and felt as if the decision had already been made by her at that point.

(*Id.* at p. 7.)  Thus, according to Plaintiff's own testimony, the decision to fire Plaintiff was made several days before she sent her first email complaining of discrimination and almost a month before sending her email about the tax issue.  (*See id.*)

As with her claims of discrimination, Plaintiff has not raised a genuine issue of material fact that Defendant's articulated reasons for terminating her employment were pretext for retaliation

---

[23](...continued)
tend to suggest that Plaintiff's complaints were completely discounted rather than that she was retaliated against by her employer.

against Plaintiff for complaining of discrimination or tax law violations.  Therefore, the Court must grant Defendant's Motion for Summary Judgment on Counts II and III.

### Conclusion

Based on the foregoing, the Court **GRANTS** Defendant's Motion for Summary Judgment. (Doc. No. 25.)  Judgment shall be entered for Defendant and the Clerk of the Court is directed to close this case.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on March <u>24</u>, 2008.

_____
PATRICIA C. FAWSETT, CHIEF JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:
Counsel of Record